**THE THATER LAW GROUP, P.C.**
M. LANI ESTEBAN-TRINIDAD
Nevada Bar No. 006967
6390 W. Cheyenne Ave., Ste. A
Las Vegas, Nevada 89108
Telephone: (702) 736-5297
Facsimile: (702) 736-5299
Attorney for Plaintiff,
KAREN MCCLURE

**UNITED STATES DISTRICT COURT**
**DISTRICT COURT OF NEVADA**

| | |
|---|---|
| KAREN McCLURE, an individual;  )<br>              Plaintiff,   )<br>vs.                          )<br>                             )<br>DELTA AIR LINES, INC., a foreign corporation, )<br>DOES 1 through 10 inclusive; ROES )<br>CORPORATIONS/ENTITIES 1 through 10 )<br>inclusive,                    )<br>              Defendants.   )<br>_____) | Case No:<br><br>**VERIFIED COMPLAINT**<br>***(JURY TRIAL DEMANDED)*** |

Plaintiff KAREN MCCLURE for her causes of action against the above-named Defendants, complains and alleges as follows:

**I.**
**INTRODUCTION**

Defendant DELTA AIR LINES INC. subjected Karen McClure to discrimination in violation of the Americans with Disabilities Act ("ADA").

For years, Plaintiff worked for Defendant. Plaintiff performed her job well. During her employment with Defendant, Plaintiff was made to suffer discrimination because of her disability and denied reasonable accommodation for her disability. Defendant refused or otherwise failed to engage in the interactive process with Plaintiff and subsequently terminated her employment for pre-textual reasons.

-1-

**II.**
**GENERAL ALLEGATIONS**

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 as this matter involves a federal question. This is an action brought under 42 U.S.C §2000e *et. seq*. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a)

2.      Venue is proper in this District. Defendant resides in the State of Nevada. 28 U.S.C. §1391(b)(1)-(2).

3.  Plaintiff KAREN MCCLURE is and was, at all times relevant herein, and at time of filing this lawsuit, an individual presently residing in the State of Nevada, Las Vegas, Nevada, Clark County. Plaintiff was an "employee" under See 42 U.S.C. §§ 12111–12117, for the purposes of this action.

4.      Upon information and belief, Defendant DELTA AIR LINES, INC. is and was, at all times relevant to herein, a foreign corporation doing business in the State of Nevada, Las Vegas. Defendants, and each of them, are an "employer" under applicable federal laws and/or 42 U.S.C. §§ 12111–12117 for purposes of this action. Defendant has over 15 employees.

5.      Plaintiff timely files this suit following receipt of Right to Sue Letter from the Equal Employment Opportunity Commission (EEOC). Plaintiff complied with all of the administrative requisites of the EEOC to file suit against Defendant.

6.      Upon information and belief, and at all times relevant hereto, Defendants named and/or fictitiously named, and/or other names, or each of them, were the agents, ostensible agents, servants, employees, employers, alter-egos, partners, co-owners and/or joint venture's of each other and of their co-Defendants, and were acting within the color, purpose, and scope of their employment, agency, ownership, and/or joint ventures, and by reason of such relationships, the Defendants, and each of them, are jointly and severally responsible and liable for the acts or omissions of their co-Defendants, as

-2-

alleged herein. The true names and capacities whether individual, corporate, associate or otherwise of Defendants DOES I through X, inclusive, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes and therefore, alleges that each of the Defendants designated herein as a DOE is legally responsible in some manner for the events and happenings herein referred to and legally caused injury and damages proximately thereby to Plaintiff as herein alleged. Plaintiff is informed and believes and thereon alleges that Defendants participated in, ratified and/or condoned the acts complained of in Plaintiff's Complaint and the subject matters of this action.

### III.
### FACTUAL ALLEGATIONS

### BACKGROUND

7.     On or about December, 2006, Plaintiff started working for Defendant's predecessor, Northwest Airlines, as Senior Propulsion Engineer Fleet Management in Minnesota. On or about 2009, Northwest Airlines merged with Defendant, whereby Plaintiff retained her employment, her position as Senior Propulsion Engineer/Fleet Management and her seniority.

8.     On or about 2009, Plaintiff made a lateral move to the position of Senior Component Engineer in Technical Operations in Atlanta, Georgia with Defendant.

9.     In May, 2009, Plaintiff moved from Minnesota to Georgia. Plaintiff received a pay raise and a bonus from Defendant. During this time, Plaintiff also consistently received above-average performance reviews and no negative performance write-ups. Plaintiff was assigned task of training Defendant's new engineers and mentored the co-op students. Plaintiff also consistently met and/or otherwise exceeded the goal of producing at least one million dollars in savings to her department.

10.     Plaintiff continued in her capacity, performing well through 2012.

-3-

11.     In or about March, 2012, Plaintiff's mother became ill. Plaintiff notified her supervisor and Plaintiff took time off to care for her ailing mother.

12.     In or about May-June 2012, Plaintiff made a lateral move as Senior Engineer for Fleet Teams in the 747 Group as a Structures Engineer. Plaintiff made this move with the hopes of attaining a promotion to the position of Principal Engineer.

13.     In June, 2012, Plaintiff's mother became ill again and her mother was hospitalized. Plaintiff notified her new supervisor, Charmaine Chin (Manager of 747s), and Plaintiff took additional time off to care for her mother. When Plaintiff returned to work, Plaintiff applied for and was granted intermittent leave under the Family Medical Leave Act (FMLA) through October, 2012. Upon information and belief, Ms. Chin was not happy that Plaintiff took FMLA leave. Plaintiff made efforts to try to make up for the time she had to be on FMLA.  As Plaintiff did so, there was some dispute over how much leave time Plaintiff had remaining.

14.     Thereafter, Plaintiff requested a meeting with Ms. Chin and her supervisor, Robert Cooney (General Manager of Fleet Teams). During this meeting, Plaintiff wanted to discuss how much time she needed to make up. Mr. Cooney agreed with Plaintiff that no time needed to be made up. Upon information and belief, Ms. Chin did not take this well.

### DEFENDANT TELLS PLAINTIFF TO TAKE SHORT-TERM DISABILITY LEAVE, ALTHOUGH NOT DISABLED AT THE TIME, PLAINTIFF REFUSES

15.     Shortly thereafter, in or about June-July 2012, Ms. Chin and Mr. Cooney called Plaintiff into a meeting in which Plaintiff was told that Plaintiff needed to go on short-term disability in order to take time off to care for her mother. Plaintiff replied that she did not need to do so because she had FMLA leave. In response, Ms. Chin told Plaintiff that she needed to go on short-term disability "to save her

-4-

job." Plaintiff became concerned and asked if there was a problem with Plaintiff's performance, to which the response was no. Plaintiff told them that she was not going to go on short-term disability.

16. Following that meeting, things started to take a turn for the worse at work. For example, Ms. Chin started micro-managing Plaintiff's work in a manner she had not done before. Ms. Chin placed unreasonable expectations and demands upon Plaintiff and became extremely critical of Plaintiff's work, including imposition of unrealistic deadlines upon Plaintiff that Ms. Chin knew Plaintiff could not meet.

## **PLAINTIFF COMPLAINS TO HUMAN RESOURCES**

17. Not long thereafter, in or about July, 2012, Defendant placed Plaintiff on a performance improvement plan (PIP), which she had never been on before in her entire six (6) year career with the airline. Ms. Chin supervised Plaintiff's PIP. Plaintiff immediately complained to Human Resources (HR) that she believed this was in retaliation for her use of FMLA and refusal to go on short-term disability. In response to this complaint, the HR representative told Plaintiff it was not retaliation. Upon information and belief, HR did not conduct any investigation before reaching this conclusion.

18. Plaintiff did her best to comply with the terms of the PIP. Ms. Chin was supposed to have regular meetings with Plaintiff to discuss her progress under the PIP, but Ms. Chin consistently cancelled and/or failed to show up at meetings to discuss Plaintiff's progress with Plaintiff.

19. By August, 2012, Plaintiff had been assigned a project, wherein Plaintiff analyzed the problem and presented it to Ms. Chin. Ms. Chin told Plaintiff she was happy with Plaintiff's work and the time Plaintiff had completed the work.

20. In or about September, 2012, Plaintiff's mother became critically ill and was hospitalized. Plaintiff took time off and regularly communicated with her supervisor concerning her work project. Plaintiff then returned to work and retroactively applied for and was granted FMLA through October, 2012.

**PLAINTIFF PUNISHED FOR TAKING FMLA LEAVE FOR HERSELF AND HER MOTHER**

21. Ms. Chin told Plaintiff it was not necessary for Plaintiff to file for FMLA and discouraged Plaintiff from doing so. Thereafter, Ms. Chin told Plaintiff that Plaintiff had to make-up for her 2-week absence while Plaintiff was on FMLA. During this period, Plaintiff's mother's health took a turn for the worse and Plaintiff started suffering aliments that required her to take time off for herself. Plaintiff therefore wanted to file for additional FMLA leave. Ms. Chin discouraged her from doing so, insisting that Plaintiff take short-term disability (STD) leave instead. Plaintiff told Ms. Chin that Plaintiff was not disabled and that she did not need to take STD. In response, Ms. Chin stated that as a result of all Plaintiff's absences, she would have to give Plaintiff a bad performance review and would put Plaintiff low in the calibrations.

22. Plaintiff's supervisor, Ms. Chin, continued to insist that Plaintiff make-up over 30 hours of time. Plaintiff asked Human Resources to assist with the issue. It was resolved that Plaintiff would cover 18 hours of missed time due to FMLA leave for Plaintiff's mother and Plaintiff's own sick time. During this time, Ms. Chin made it difficult for Plaintiff to do her job and was often slow to respond to Plaintiff's requests.

23. In or about September, 2012, Plaintiff's mother became ill again, requiring Plaintiff to take time off work for which she was allowed FMLA leave through October, 2012. During this time, Plaintiff worked from the hospital, taking her work laptop and would call Ms. Chin regularly and respond to work emails.

24. In or about October, 2012, Ms. Chin started regularly visiting Plaintiff in her workspace and asking in a very loud voice, "What have you done today?" in a tone implying that Plaintiff was not doing anything.

25. When Plaintiff applied for FMLA, Ms. Chin required Plaintiff to cover her two (2) week absence from work during the time she cared for her mother. Plaintiff found this difficult as there was no formal time tracking method with Defendant, nonetheless Plaintiff maintained a spreadsheet tracking her time. Based on this information, Plaintiff believed she had 80 hours combined time that she could use to cover her absence. Plaintiff told Ms. Chin, but Ms. Chin insisted that this was not correct. When Plaintiff provided a spreadsheet of the time, Ms. Chin again said that this was incorrect and insisted that Plaintiff "owed" Defendant time. Ms. Chin forced Plaintiff to work extra hours to "make up" time that Ms. Chin insisted Plaintiff owed.

26. During this time, Plaintiff had to use her FMLA again as her mother's health had taken a turn for the worse. Plaintiff told Ms. Chin she had to leave due to her mother's health. Ms. Chin was not happy.

### DEFENDANT URGES PLAINTIFF NOT TO APPLY FOR FMLA BUT TO TAKE SHORT TERM DISABILITY LEAVE

27. When Plaintiff returned to work from her recent FMLA leave, Plaintiff became very ill at work and had to take time off. The next day, Ms. Chin called a meeting with Robert Cooney and Plaintiff in which Plaintiff was told that Plaintiff should not file FMLA, that it was not necessary and that Plaintiff should instead apply for short-term disability.

28. In response, Plaintiff told Ms. Chin that Plaintiff was not disabled and that Plaintiff did not need to go on short-term disability. Ms. Chin replied that all of Plaintiff's absences had kept work from getting done. Ms. Chin threatened Plaintiff, stating that if Plaintiff did not go on short-term disability leave, Ms. Chin would have to give Plaintiff a negative performance review and that Ms. Chin would put Plaintiff low in the calibrations. When Plaintiff refused, Ms. Chin told Plaintiff that Ms. Chin would give Plaintiff a bad evaluation.

-7-

29. Ms. Chin kept insisting that Plaintiff had over thirty (30) hours to make up as a result of her FMLA absences. As a result, Plaintiff complained about Ms. Chin's insistence that she make up these hours and asked for a meeting with Mr. Cooney to get the issue resolved. Again, there was no formal tracking of time at Delta for merit employees. Mr. Cooney decided that Plaintiff owed 18 hours, mainly due to the time Plaintiff missed for caring for her mother and Plaintiff's own illness. Following her complaints and the ensuing meeting, Ms. Chin retaliated against Plaintiff and made it very difficult for Plaintiff to do her job, including, but not limited to, embarrassing Plaintiff, refusing her requests for software, denying her use of co-ops on her projects, and not responding to emails promptly, if at all.

30. As a result of Ms. Chin's behavior towards Plaintiff, Plaintiff started to look for positions outside of Ms. Chin's group.

31. In or about December, 2012, Plaintiff missed one week of work due to jury duty. Plaintiff would call in to the office daily and checked work emails. During the calls, Plaintiff frequently offered to come into the office after she was dismissed from jury duty for the day. Ms. Chin told Plaintiff it was not necessary. Plaintiff also volunteered to work on December 25, 2015. Ms. Chin stated it was not necessary.

32. During her regular work schedule, Ms. Chin would schedule meetings with Plaintiff that required her to stay late and work off the clock.

## **RETALIATION**

33. In or about January, 2013, Ms. Chin issued Plaintiff a poor performance review and Plaintiff was told that Plaintiff would be placed on a Performance Improvement Plan (PIP). Plaintiff complained to Defendant's Human Resources that Plaintiff believed that the negative performance evaluation and the PIP were in retaliation for her use of FMLA and Plaintiff's refusal to go on forced short-term disability leave.

34. Plaintiff started her PIP and did her best to comply successfully. The PIP required daily meetings with Ms. Chin to discuss projects and priorities. Under the PIP, Ms. Chin was to provide Plaintiff with training classes so that she could "improve" her weak areas. Plaintiff successfully completed the Leadership Training Class, but could not take the other class because Ms. Chin had to register Plaintiff for these classes, but did not. Plaintiff believed that Ms. Chin would go out of her way to humiliate Plaintiff while she was on her PIP, including, but not limited to publicly reprimanding Plaintiff in the presence of other co-workers to make it known that Plaintiff was on a PIP in violation of Delta policies.

35. In or about May, 2013, Plaintiff was taken off the PIP. In that same month, Plaintiff suffered an injury as a result of a physical attack in which her ACL was completely severed and her meniscus flipped and torn. Plaintiff also started suffering panic attacks as a result.

36. In or about June, 2013, Plaintiff had knee surgery, requiring days off from work for recovery.

37. By August, 2013, tensions between Ms. Chin and Plaintiff started to escalate. Plaintiff requested a meeting with Ms. Chin to try to remedy the issue. During the meeting, Plaintiff brought notes in which Plaintiff highlighted her concerns regarding FMLA retaliation, Ms. Chin's announcing to coworkers that Plaintiff was on PIP, Ms. Chin's being overcritical of Plaintiff's work, and specific projects where Ms. Chin had told Plaintiff incorrectly to do things. When Plaintiff did so, Ms. Chin became very agitated and defensive. Before ending the meeting, Ms. Chin demanded that Plaintiff give Ms. Chin her notes, which Plaintiff did.

38. On or about August 15, 2015, Ms. Chin gave Plaintiff a poor mid-year performance review. Ms. Chin ended the meeting with the statement that if Plaintiff's performance did not improve, Plaintiff would no longer have a job.

39. That afternoon, Plaintiff requested a meeting with Mr. Cooney to share her concerns about Plaintiff's mid-year review. Mr. Cooney ended the meeting stating that Plaintiff only gets to be on PIP once. After this meeting, Plaintiff suffered depression and experienced a mental breakdown. As a

-9-

result, Plaintiff applied for and received short-term disability leave. Plaintiff sought therapy and went on medication.

40. Plaintiff informed Ms. Chin and Mr. Cooney that Plaintiff would be on short-term disability leave.

41. In or about the last week of October, 2013, Defendant required Plaintiff to return to work against her therapist's advice.

42. In or about November 6, 2013, Plaintiff returned to work.

43. When Plaintiff returned to work, Plaintiff had a meeting with Mr. Cooney, Ms. Chin, and Mr. John MacDonald to discuss Plaintiff's limitations due to her disabilities. Plaintiff was referred to Delta's Workplace Accommodation, which Plaintiff did. When Plaintiff met with Defendant's Workplace Accommodation, they provided input regarding her physical injury but did not provide insight for her PTSD.

44. On or about November 14, 2013, Plaintiff provided Defendant with a letter from her therapist listing specific accommodations Plaintiff required for her PTSD and knee injury.

45. In or about November 27, 2013, Plaintiff sent an email updating Defendant on the treatment plan from Plaintiff's doctor.

46. In or about December 18, 2013, Plaintiff had a meeting with Defendant to discuss specific accommodations for her knee injury, but Defendant did not provide Plaintiff with any accommodations for her PTSD. No accommodations were provided to Plaintiff for her PTSD, despite her doctor's insights.

47. In or about December, 2013, Plaintiff requested a demotion to Engineer where Plaintiff believed she could achieve expectations of the position given her mental and/or emotional limitations due to her PTSD. Defendant denied Plaintiff's request. Plaintiff requested that Defendant move her to a different area to meet her accommodation requirements, to which they responded that they would not pass along a poor performing employee to be a problem for another area.

48. In or about December 27, 2013, Plaintiff was informed that she would be receiving a write up for an incident with Ms. Chin that occurred in August, 2013.

-10-

49. In or about January, 2014, Plaintiff provided statements in her self performance review that she was suffering from PTSD and she requested accommodations for this disability but was denied. Plaintiff stated that as a result her performance had been impacted. Mr. John MacDonald asked Plaintiff to remove these statements from her self-performance review. Plaintiff did not do so.

50. In or about February 6, 2015, Plaintiff had a meeting with Defendant in which she was told that they would not accommodate her PTSD in her current position. As a result, Defendant told Plaintiff that she would have to go on an indefinite unpaid leave of absence until Plaintiff could find a new position.

51. In or about April, 2014, Plaintiff returned to work from a six week short term disability leave.

52. In or about July 2014, Defendant terminated Plaintiff from her employment citing performance issues.

## DISCRIMINATION

### IV.
### CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### DISABILITY DISCRIMINATION
### 42 U.S.C. §§ 12111–12117
### (AMERICANS WITH DISABILITIES ACT ("ADA"))

53. Plaintiff repeats and re-alleges each and every allegation made in the paragraphs above, as though set forth fully herein.

54. At all times relevant hereto, Plaintiff is and was a qualified individual with a disability and/or Defendant otherwise regarded Plaintiff as an individual with a disability.

55. Defendant subjected Plaintiff to adverse and tangible employment actions.

56. Defendant subjected Plaintiff to adverse and tangible employment actions on the basis of her disability.

57. Defendant failed refused and or/otherwise neglected to engage in the interactive process with Plaintiff and/or provide her with reasonable accommodation for her disability.

58. Upon information and belief, similarly situated employees, who did not have a disability, were treated more favorably than Plaintiff and were not subjected to the adverse and tangible employment actions imposed upon Plaintiff by Defendant.

59. By subjecting Plaintiff to disability discrimination, Defendant violated state and federal law, specifically the Americans with Disabilities Act (ADA).

60. That, as a direct and proximate result of Defendant's acts and conduct, Plaintiff incurred and continues to incur medical expenses, possible future medical expenses, great pain of body and mind, loss of earnings, loss of earning capacity, loss of enjoyment of life, all to Plaintiff's detriment in an amount to be determined, according to proof at time of trial.

61. Defendant's actions were intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard for the harm caused to Plaintiff.

62. As a further result of Defendant's above actions, Plaintiff has been required to engage the services of attorneys and is, therefore, entitled to an award of reasonable attorneys' fees, costs and interest/incurred herein.

**SECOND CAUSE OF ACTION**
**FAMILY MEDICAL LEAVE ACT (FMLA) / 29 U.S.C. §§ 2601-2654**

63. Plaintiff repeats and re-alleges each and every allegation made in the paragraphs above, as though set forth fully herein.

64. Plaintiff was an eligible employee under FMLA and entitled to FMLA.

65. Plaintiff lawfully exercised and/or attempted to exercise her rights provided under FMLA. Plaintiff's intention to take FMLA leave was given to Defendant.

66. Defendant interfered, restrained and/or denied Plaintiff's attempt to exercise her rights provided under FMLA in violation of 29 U.S.C. §2601-2654.

67. That as a direct and proximate result of Defendant's acts and conduct, Plaintiff incurred and continues to incur, economic damages, great pain of body and mind, medical and future medical expenses, loss of earnings, loss of earning capacity, loss of enjoyment of life, and other damages, all to Plaintiff's detriment in an amount to be determined, according to proof at time of trial.

68. As a further result of Defendant's above described actions, Plaintiff has been required to engage the services of attorneys and is, therefore, entitled to an award of reasonable attorneys' fees, costs and interest/incurred herein.

### THIRD CAUSE OF ACTION
### FAMILY MEDICAL LEAVE ACT (FMLA) RETALIATION
### 29 U.S.C. §§ 2601 *et. seq.*

69. Plaintiff repeats and re-alleges each and every allegation made in the paragraphs above, as though set forth fully herein.

70. Plaintiff complained to Defendant about certain actions that she believed were discriminatory on the basis of the use of rights and leave under the FMLA.

71. Shortly after her complaints to Defendant, Plaintiff was issued adverse employment actions and ultimately terminated from her employment with Defendant.

72. Plaintiff suffered these adverse and tangible employment actions, including her termination, as a direct and proximate result of the exercise of her rights and use of FMLA.

### FOURTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)

73. Plaintiff repeats and re-alleges each and every allegation made in the paragraphs above, as though set forth fully herein.

74. That the conduct of Defendant, its agents, employees, and/or representatives, was extreme and outrageous and done for the purpose of injuring Plaintiff.

75. That the conduct of Defendant, and each of them, its agents, employees and/or representatives were intentional, malicious, willful and/or outrageous, and therefore, constitutes an intentional infliction of emotional distress to Plaintiff, including, but not limited to the following, Plaintiff's Supervisor repeatedly publicly humiliating Plaintiff in the workplace and making it known that Plaintiff was on a PIP; Forcing Plaintiff to take short-term disability leave at a time when she was not otherwise disabled.

76. That, as a direct and proximate result of Defendant's conduct, Plaintiff suffered emotional distress which caused, and will continue to cause, Plaintiff severe and extreme mental pain and suffering.

77. That, as a direct and proximate result of Defendant's acts and conduct, Plaintiff incurred and continues to incur, economic damages, great pain of body and mind, loss of earnings, loss of earning capacity, loss of enjoyment of life, all to Plaintiff's detriment in an amount to be determined, according to proof at time of trial.

78. That Defendant's conduct constitutes intentional, malicious, willful, and wanton acts, thereby entitling Plaintiff to punitive damages according to proof to be determined at time of trial.

79. As a further result of Defendant's above actions, Plaintiff has been required to engage the services of attorneys and is, therefore, entitled to an award of reasonable attorneys' fees, costs and interest/incurred herein.

WHEREFORE, Plaintiff prays for the following relief:

1. Back-pay, front pay, lost benefits, statutory and other recoverable damages, and pre-judgment interest and post-judgment interest;

2. Compensatory damages, and damages for mental or emotional pain and suffering, as permitted by applicable law, according to proof, to be determined at time of trial;

3. Punitive and/or other permissible damages, according to proof to be determined at time of trial;

4. Attorney's fees, expenses and costs of suit; and

5. Such other and further relief as the Court may wish to entertain.

DATED this 18th day of December, 2015.

**THE THATER LAW GROUP, P.C.**

BY: /s/ M. Lani Esteban-Trinidad
M. LANI ESTEBAN-TRINIDAD
Nevada Bar No. 006967
6390 W. Cheyenne Ave., Ste. A
Las Vegas, Nevada 89108
Telephone: (702) 736-5297
Facsimile: (702) 736-5299

Attorney for Plaintiff,
KAREN MCCLURE

-15-

## JURY DEMAND

Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury as to all issues.

DATED this 18th day of December, 2015.

**THE THATER LAW GROUP, P.C.**

BY: /s/ M. Lani Esteban-Trinidad
M. LANI ESTEBAN-TRINIDAD
Nevada Bar No. 006967
6390 W. Cheyenne Ave., Ste. A
Las Vegas, Nevada 89108
Tel: (702) 736-5297
Fax: (702) 736-5299

Attorney for Plaintiff,
KAREN McCLURE